DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Vinton County Common Pleas Court, Juvenile Division, judgment that awarded the Vinton County Department of Job and Family Services (JFS) permanent custody of Aaron Workman (date of birth November 2, 1995), Teddy Workman, Jr. (date of birth September 24, 1992), and Daniel Workman (date of birth January 17, 1994).[1]
 {¶ 2} Appellant, Catherine Hartley,[2] the natural mother of the children, assigns the following error for review:
"Revised Code Section 2151.414(B)(1)(d) violates parents' substantive due process right to the care, custody and control of children, and is facially invalid as a consequence."
 {¶ 3} Our review of the record reveals the following facts pertinent to the instant appeal. On February 17, 2000, JFS caseworker M. Christine DeAloia filed complaints alleging Teddy, Jr., and Daniel to be neglected and dependent children. On the same date, JFS filed a complaint alleging Aaron to be a dependent child. The complaints alleged that as of February 10, 2000, Teddy, Jr. and Daniel had missed a substantial amount of school due to lice.[3] For example, since August of 1999: (1) Teddy missed thirty-four days of school; and (2) Daniel missed sixty-three days of school. The complaint alleged that the children had been repeatedly sent home from school because of lice, despite JFS having provided lice treatment on six different occasions since October of 1999.
 {¶ 4} On May 1, 2000, the trial court conducted an adjudicatory and a dispositional hearing. The father of the children, Teddy Workman, Sr., did not appear at the hearings. Appellant admitted that all three children are dependent[4] and agreed to place the children in JFS's temporary custody. JFS had developed a case plan with a goal of reunifying the children with appellant. On June 29, 2000, the three children were reunited with appellant, subject to JFS's protective supervision.
 {¶ 5} On January 31, 2001, JFS filed a motion to modify the disposition to temporary custody. JFS alleged that: (1) the children were living in a violent household; (2) while in the children's presence, appellant threatened to kill the children's father; (3) appellant smashed the father's car windows; (4) the home was infested with roaches and Aaron had to go to the hospital to have a cockroach removed from his ear; (5) the children had poor school attendance; and (6) appellant stated that she could not care for children. On January 31, 2001, the trial court granted the motion.
 {¶ 6} On February 5, 2001, the trial court held a hearing regarding JFS's request for temporary custody. At the hearing, appellant agreed to placing the children in JFS's temporary custody. JFS developed another case plan with a goal of reunifying the children with appellant.
 {¶ 7} In May of 2001, the father of the children entered an appearance in the case. He requested, and was appointed, counsel. He then filed motions for a home study, for visitation, and for custody of the children.
 {¶ 8} On March 12, 2002, JFS filed motions to seek permanent custody of all three children. JFS alleged that the children had been in its temporary custody for twelve or more of the prior twenty-two months.
 {¶ 9} On July 16, 2002, the guardian ad litem filed her report and noted that shortly after the children's initial removal from appellant's home, the children's condition rapidly improved. For example, Teddy, Jr.'s teacher noted that he appeared clean and healthy and that his recurring sinus infection had improved. All of the children's basic skills had improved. The guardian ad litem further reported that after the children visited their father, the foster parents noticed a deterioration in the children's behavior. The guardian ad litem concluded that neither appellant nor the children's father are able to properly parent the children or to appropriately care for the children's basic needs. She stated that appellant and the children's father have neglected the children's medical, educational, and developmental needs. She concluded that granting JFS permanent custody would serve the children's best interest by providing them with a stable, loving home "with nurturing capable adults who will care for them."
 {¶ 10} On July 22, 2002, and continuing on July 24, 2002, the trial court held a hearing to consider the permanent custody motions. At the hearing, evidence was adduced to show that appellant and the children's father are not married and never have been married. They lived together with their three children for a period of time, but in January of 2001, the father moved from the home and left appellant to care for the three children. Several months after the father left appellant, appellant began living with Ricky Friend. Shortly thereafter, the father began living with Mary Ann Friend, Ricky's wife.
 {¶ 11} At the time of the hearing, appellant lived in a two-bedroom house trailer with her twenty-one year old nephew and a friend named Kevin Halterman. She was not employed and has never held a permanent job. Neither her nephew nor Halterman has a permanent source of income. Appellant explained that she is trying to receive disability assistance for her asthma and emphysema.
 {¶ 12} While the children were in JFS's custody, appellant visited with the children twice per month. Appellant stated that she does not want JFS to be granted permanent custody of the children. She thinks that the children should live with either her or their father.
 {¶ 13} At the time of the hearing, the children's father lived in a four bedroom home with Mary Ann Friend, the father's three daughters that he had with another woman, and Mary Ann's daughter. He stated that he does not currently work and he receives "SSI."
 {¶ 14} The father testified that he does not believe JFS should be granted permanent custody of the children. He stated that his home has plenty of room for the three boys. He explained that he bought new furniture for the boys, including bunk beds and dressers. The father admitted, however, that he has a prior sexual imposition conviction but denied that he was guilty of the charges. He stated that he pled guilty just to have the matter resolved.
 {¶ 15} Caseworker DeAloia testified that on January 31, 2001, the children were taken into JFS's custody because appellant did not have any income, the "home was overrun with cockroaches," and appellant could not feed or care for children. She stated that: (1) the home contained little food for the children to eat and that as of January 31, 2001, the children's father was no longer living at the home; (2) appellant was behind on rent and she was emotionally unstable; (3) appellant had taken the children to appellant's mother, but appellant's mother could not care for them; and (4) on one occasion, appellant sent the children to appellant's mother's home wearing sandals when there was snow on the ground. DeAloia stated that the case plan addressed three basic goals: (1) to secure the children's basic needs by providing sufficient income, by ensuring that the children attend school, and by ridding the home of lice and roaches; (2) to provide a stable home life by controlling the children's unruly behavior and by providing effective parenting skills; and (3) to provide adequate supervision of the children.
 {¶ 16} With respect to the children's father, DeAloia stated that she did an unannounced visit to his home during an eight-hour Saturday visit. She testified that the children had tools and were destroying a car that their father told them they could destroy. DeAloia stated that she believed allowing the children to use tools to destroy a car was dangerous and taught the children that destructive behavior was acceptable.
 {¶ 17} She further stated that she learned that the father had given Teddy, Jr. a knife and that Teddy, Jr. then threatened to stab a student. She testified that she heard Teddy, Jr. threatened students so many times that he was suspended. DeAloia stated that she spoke to the father about giving Teddy, Jr. a knife, but a few months later, he purchased pocket knives for the children.
 {¶ 18} DeAloia testified that the children have "pretty severe behavior problems" that the father does not seem to understand. She related her belief that the father "minimizes" the children's behavior problems because he does not understand them. She explained that after Aaron and Teddy, Jr. were diagnosed with attention deficit hyperactivity disorder, the father stated that "he wanted them [to] be their selves [sic]" and he did not think they should take medication.
 {¶ 19} DeAloia stated that after the children visited with their father, the foster parents noticed changes in the children's behavior, such as being aggressive at school and wetting the bed. She further stated that Aaron had some sexual acting out after visits with the father.
 {¶ 20} DeAloia opined that the father is not capable of handling all three children. She explained that the children need intensive supervision. DeAloia testified that if the children were placed with the father, the children would need intensive monitoring, meaning having someone in the home everyday to supervise. DeAloia stated that although the father appeared to be bonded with the children, he did not attend all of the scheduled visits. She further noted that Aaron has stated that he does not want to visit with his father.
 {¶ 21} Dr. Kenneth Murray of Scioto Paint Valley Mental Health Center testified that he provided services to the three children and to the father. He stated that all three children "have significant behavior problems and they would be difficult to deal with in a specialized foster home or residential center or anywhere you're going to have problems." He stated that "specifically trained professionals would have difficulties with these boys."
 {¶ 22} Dr. Murray stated that Aaron's behavioral problems included: (1) lying: (2) being aggressive; (3) being destructive; (4) having poor school behavior; and (5) being defiant. Dr. Murray testified that Aaron seemed to have more trouble before and after visiting with his father. Dr. Murray testified that Aaron seems bonded with his foster family and has not expressed whether he would like to live with his father.
 {¶ 23} Dr. Murray also stated that Daniel's behavior problems included: (1) lying; (2) being destructive; (3) having poor school behavior; (4) having poor school attendance; and (5) being disobedient at home. Dr. Murray testified that Daniel would like to live with his father.
 {¶ 24} Dr. Murray further stated that Teddy, Jr.'s behavior problems included: (1) temper tantrums; (2) being defiant; (3) lying; (4) being aggressive; (5) being destructive; (6) having poor school behavior; and (7) difficulty concentrating and paying attention. Dr. Murray testified that Teddy, Jr. has bonded with his foster family and that he once stated that he did not want to return to his father.
 {¶ 25} Dr. Murray opined that the father cannot adequately parent the children. Because all three children need highly structured environments in order to have future success, Dr. Murray related his belief that the father does not have the ability to handle the children's special needs. He stated that the father's "primary obstacle [regarding parenting] is his own limited intellectual ability."
 {¶ 26} On October 23, 2002, the trial court granted JFS permanent custody of the three children. The trial court first determined that the children had been in JFS's temporary custody for more than twelve of the prior twenty-two months. The court then considered whether the children's best interests would be served by granting JFS permanent custody.
 {¶ 27} With respect to the children's interaction and interrelationship with the children's parents, siblings, relatives, and foster care givers, the trial court found that: (1) the children are bonded with both the father and the foster care parents, but are not bonded with appellant; (2) Daniel and Aaron live in the same foster home and are bonded; (3) all three children visit with each other and enjoy being together; and (4) the children "have some relationship with Mary Ann Friend, her daughter and [the father's] three daughters."
 {¶ 28} The trial court found the following regarding the children's wishes: (1) Aaron has been "nonverbal" in expressing who he wants to live with, but is bonded with his foster parents; (2) Teddy, Jr. once expressed a desire to live with his father and is bonded with his foster parents; and (3) the trial court was not aware whether Daniel has expressed any interest in who he would like to live with, but he is bonded with his foster parents.
 {¶ 29} With respect to the children's custodial history, the trial court found the following: (1) the children have been in JFS's temporary custody from January 31, 2001 through the date of permanent custody hearing, July 22, 2002, for a total of seventeen months; and (2) before January 31, 2001, all three children were in JFS's temporary custody from May 1, 2000 to July 2000.
 {¶ 30} The trial court further noted the following with respect to the children's father's involvement in their lives: (1) on February 23, 2000, the father was served with the original complaints; (2) the court advised the father numerous times of his right to attorney; (3) the father took no action-he did not attend the adjudicatory hearing and he did not respond to the case plan amendments; (4) on May 9, 2001, the father requested and was granted counsel; (5) on July 11, 2001, the father requested visitation and custody; and (6) the father initially decided not to participate in the court proceedings because he wanted to give appellant an opportunity to be reunified with the children.
 {¶ 31} The trial court found the following with respect to the children's need for a legally secure permanent placement: (1) Daniel is a special needs child, is a hard child to place, and requires placement in a therapeutic foster home; (2) Aaron is a special needs child, is a hard to place child, and should be in a therapeutic foster home; (3) Teddy, Jr. is special needs child, is a hard to place child, and should be in therapeutic foster home; (4) all three children must be in a highly structured environment; (5) all three children need appropriate medical protocol; (6) all three children need continued specialist counseling; and (7) to successfully reunify the children with either appellant or the father would require close supervision and monitoring. The court expressed its concern that the father would not be able to provide the close supervision and monitoring that the children need, in light of the father's living situation with his three daughters and his paramour's daughter.
 {¶ 32} The court noted that the father is bonded with his three children, loves his children, and has been sincere in his desire to gain custody. The court further found, however, that the father minimizes the children's special needs. The court additionally noted that the father waited approximately seventeen months to become involved in the case or to otherwise help the three children. The court concluded that considering the "special needs of the boys, including the need for a highly structured environment, close monitoring, continued individual counseling, continued family counseling, and continued need for consistent medical protocol," the father would not be likely to provide the consistency that the children need.
 {¶ 33} The court noted that appellant has had at least four different residences, several of which have been unsuitable, and is not employed. The court found that appellant's current living arrangement does not provide the needed living situation for the children and that she cannot provide a legally secure placement for children.
 {¶ 34} The court then considered whether any of the factors set forth in R.C. 2151.414(E)(7) to (11) applied. The court noted that on March 21, 2000, the father pleaded guilty to R.C. 2907.06(A)(1), but that the offense did not involve a child.
 {¶ 35} Based on the foregoing, the trial court concluded that the children's best interests would be served by granting JFS's request for permanent custody. Appellant filed a timely notice of appeal.In her sole assignment of error, appellant argues that R.C. 2151.414(B)(1)(d) is facially unconstitutional. In particular, appellant asserts that the statute, by not requiring a trial court to find that a parent is unsuitable or unfit, unconstitutionally deprives a parent of the parent's fundamental rights to the care, custody, and control of the parent's children. Appellant, in essence, contends that a permanent custody proceeding brought pursuant to R.C. 2151.414(B)(1)(d) is unconstitutional because the statute does not require any finding of parental fault, unfitness, or unsuitability. Appellant argues that R.C. 2151.414(B)(1)(d) "has the effect of simply turning a permanent custody hearing involving any parent, on the one hand, and the State, on the other, into a contest over the best interest of the child." We disagree with appellant.
 {¶ 36} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Santosky v. Kramer (1982),455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Murray (1990),52 Ohio St.3d 155, 156, 556 N.E.2d 1169, 1171. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'"In re Cunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (quotingIn re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
 {¶ 37} The termination of parental rights has been described as "`the family law equivalent of the death penalty in a criminal case.'" Inre Hoffman, 97 Ohio St.3d 92, 2002-Ohio-5368, ¶ 14, quoting In reSmith (1991), 77 Ohio App.3d 1, 16. As such, "in permanent custody proceedings, parents must be afforded due process before their rights can be terminated." In re Hoffman, at ¶ 15 (citing Santosky v. Kramer
(1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599). Due to the substantial nature of the right, parents must be afforded "every procedural and substantive protection the law allows." In re Hayes
(1997), 79 Ohio St.3d 46, 48. "When the State moves to destroy * * * familial bonds, it must provide the parents with fundamentally fair procedures." Santosky 455 U.S. at 753-754.
 {¶ 38} R.C. 2151.414 sets forth the detailed procedure that a trial court must follow before granting a children services agency's motion for permanent custody. Relevant to the case at bar, R.C.2151.414(B)(1)(d) requires a trial court to first find that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 39} Appellant asserts that the foregoing provision renders the statute fatally flawed because the provision does not first require the trial court to find that the parent is unable, unsuitable, or unfit to care for the child. We disagree with appellant. Contrary to appellant's assertion, we believe that inherent within R.C. 2151.414(B)(1)(d) rests the finding that the parent is unable, unsuitable, or unfit to care for the child. If the child has been placed in a children services agency's temporary custody for at least twelve months of the prior twenty-two months, some reason must exist why the child has not been in the parent's care. The reason normally would be because the parent has been unable to demonstrate that the parent is able, suitable, or fit to care for the child. Cf. Troxel, 530 U.S. at 68-69 ("Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."). R.C. 2151.414(B)(1)(d) thus contains an implicit presumption that the parent is unable, unsuitable, or unfit to care for the child. In enacting R.C. 2151.414(B)(1)(d), it appears that the Ohio General Assembly intended to provide a presumption that a parent who is unable to be reunified with the child within the twelve-month period is necessarily unable, unsuitable, or unfit to care for the child. See In re Fricke, Allen App. Nos. 1-02-75, 1-02-76, 1-02-77, 2003-Ohio-1116 ("Once the children have been in custody for 12 of the previous 22 months, the parents are presumed to be unfit and all the trial court must find is that granting permanent custody is in the best interests of the children.").
 {¶ 40} We do not believe that R.C. 2151.414(B)(1)(d) deprives a parent of fundamentally fair procedures. Prior to instituting a permanent custody proceeding under R.C. 2151.414(B)(1)(d), the parent has twelve months to demonstrate that the parent is able, suitable, or fit to care for the child. Thus, the parent is not deprived of the ability to be reunified with the child or to demonstrate the parent's ability, suitability, or fitness to care for the child.
 {¶ 41} In In re Thompson, Franklin App. Nos. 02AP-557 and 02AP-558, the court rejected the argument that R.C. 2151.414 deprives a parent of due process in violation of the principles set forth in Troxelv. Granville (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49, Parhamv. J.R. (1979), 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101, Wisconsinv. Yoder (1972), 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, and Princev. Massachusetts (1944), 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645. The court explained:
"`We agree with appellant that it is apparent that the legislature in Ohio has made the best interest of the child the touchstone of all proceedings addressing a permanent commitment to custody. The legislature has also recognized, however, that when the state seeks to terminate parental custody, parents are entitled to strict due process guarantees under the Fourteenth Amendment to the United States Constitution, including a hearing upon adequate notice, assistance of counsel, and (under most circumstances) the right to be present at the hearing itself. Ohio has accordingly incorporated appropriate due process requirements in the statutes and rules governing juvenile adjudications and dispositions, which are reflected in the extensive and rather intricate statutory framework expressed in R.C. 2151.413 and 2151.414. The statutes appropriately reflect the need to balance the extraordinarily significant rights and interests: parents' rights and interest in the custody, care, nurturing, and rearing of their own children, and the state's parens patriae interest in providing for the security and welfare of children under its jurisdiction, in those unfortunate instances where thorough and impartial proceedings have determined that the parents are no longer in the best position to do so.
We do not find that the balance struck by the legislature in achieving this reconciliation between occasionally incompatible goals has been shown to be constitutionally offensive. Moreover, we do not read the cases cited by appellant as imposing a strict constitutional bias, favoring parental custody under all circumstances.'"
(Quoting In re Thompson (Apr. 26, 2001), Franklin App. No. 00AP-1358).
 {¶ 42} Moreover, we note that appellant's reliance on Troxel in the case at bar is misplaced. In Troxel, a children services agency was not involved in seeking custody of the child. Troxel was not a permanent custody case. Instead, Troxel involved a grandparent's right to visitation. As the Troxel court noted, no "special factors" existed to "justify the State's interference with Granville's fundamental right to make decisions concerning the rearing of her two daughters." Troxel v.Granville 530 U.S. at 68.
 {¶ 43} Consequently, we disagree with appellant that R.C.2151.414(B)(1)(d) deprives a parent of due process rights. Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Vinton County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kline, J. Evans, P.J.: Concur in Judgment Opinion.
[1] We note that appellee asserts in its appellate brief that two of the children's names, Aaron and Daniel, have been misspelled throughout the majority of the trial court proceedings. Appellee states that the correct spellings are Arron and Danial. We will nevertheless use the spellings as they appear on the initial complaint filed in the trial court (Aaron and Daniel).
[2] In her appellate brief, appellant spells her name as Katherine. We will use the spelling that is used in the records from the trial court proceedings (Catherine).
[3] At the time that JFS filed the motions, Aaron was four-years old and was not attending a public school.
[4] JFS dismissed the neglect allegations.